UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

U.S. COMMODITY FUTURES
TRADING COMMISSION,

          Plaintiff,

vs.                                    Case No. 8:17-cv-213-T-24-MAP

ANTHONY J. KLATCH II;
LINDSEY HEIM; &
ASSURANCE CAPITAL
MANAGEMENT, LLC,

          Defendants.

_____/

## ORDER FOR FINAL JUDGMENT BY DEFAULT, PERMANENT INJUNCTION, CIVIL MONETARY PENALTIES, AND ANCILLARY STATUTORY AND EQUITABLE RELIEF

On January 26, 2017, the Commodity Futures Trading Commission ("Commission" or "Plaintiff") filed a Complaint charging Defendants Anthony Klatch, Lindsey Heim, and Assurance Capital Management, LLC ("ACM") (collectively, "Defendants") with violating Sections 4b(a)(1)(A)-(C), 4c(b), 4o(1), and 6(c)(1) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6b(a)(1)(A)-(C), 6c(b), 6o(1), & 9(1) (2012), and Commission Regulations 4.20, 33.10, and 180.1(a)(1)-(3), 17 C.F.R. §§ 4.20, 33.10, & 180.1(a)(1)-(3) (2016). (Doc. 1).

Klatch was served with a copy of the summons and complaint on February 1, 2017. (Doc. 8). ACM was served with a copy of the summons and complaint on March 13, 2017. (Doc. 14). Plaintiff mailed a waiver of service form, pursuant to Fed. R. Civ. P. 4(d), to Heim on February 6, 2017, which Heim executed and returned to Plaintiff. (Doc. 11). Each Defendant failed to respond the Complaint within the time permitted by Rule 12 of the Federal Rules of Civil Procedure. Accordingly, the Commission filed motions for entry of a Clerk's default against Defendants. (*See*

Docs. 9, 16, & 18)  The Clerk entered default against Klatch on March 1, 2017 (Doc. 10), ACM on April 5, 2017 (Doc. 17), and Heim on April 11, 2017 (Doc. 20).  As a result, all of the well-pleaded allegations in the Commission's Complaint are deemed admitted by Defendants.  *See Nishimatsu Const. Co. v. Houston Nat. Bank,* 515 F.2d 1200, 1206 (5th Cir. 1975). In addition to the pleadings, a court considering a motion for default judgment may also rely on evidence such as affidavits and declarations. *See Frazier v. Absolute Collection Serv., Inc.*, 767 F. Supp. 2d 1354, 1362 (N.D. Ga. 2011) (citation omitted).

The Commission has moved this Court to grant final judgment by default against Defendants, order permanent injunctive relief, and impose a restitution obligation and a civil monetary penalty.

The Court having carefully considered the Complaint, the allegations of which are well-pleaded and hereby taken as true, the Commission's memorandum in support of this motion, the record in this case, and the Court being otherwise advised in the premises, it is hereby:

**ORDERED** that the Commission's Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalties, and Ancillary Statutory and Equitable Relief Against All Defendants is **GRANTED**.  Accordingly, the Court enters findings of fact, conclusions of law, and an Order of Final Judgment by Default for Permanent Injunction, Civil Monetary Penalties, and Other Statutory and Equitable Relief ("Order") pursuant to Sections 6c and 6d of the Act, 7 U.S.C. § 13a-1 (2012), as set forth herein.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    Findings of Fact

#### A.    The Parties to This Order

1.    Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency that is charged by Congress with administering and enforcing the Act, 7 U.S.C.

§§ 1-26 (2012), and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 – 190.10 (2016). (Doc. 1, ¶ 26).

2.      Defendant Assurance Capital Management, LLC is a Florida limited liability company whose last known address is 2914 W. Gandy Boulevard, Unit E, Tampa, FL 33611. (Doc. 1, ¶ 27). ACM was engaged in a business that is of the nature of a commodity pool, investment trust, syndicate, or similar form of enterprise, and in connection with that business, solicited, accepted, or received from others, funds, securities, or property, for the purpose of trading in commodity interests. (Doc. 1, ¶ 27). Since its inception in June 2015, ACM was a commodity pool operator. ACM has never been registered with the Commission in any capacity. (Doc. 1, ¶ 27).

3.      Defendant Lindsey Heim is a resident of Tampa, Florida. Heim was the manager, principal, and registered agent of ACM. (Doc. 1, ¶ 29). Heim exercised ownership and control over ACM, directing its operation and conduct. (Doc. 1, ¶ 29). Heim served as the sole signatory on ACM bank accounts and the sole authorized person on ACM's trading account. (Doc. 1, ¶ 29). Heim solicited investors for ACM and held herself out as being involved in managing ACM's risk. (Doc. 1, ¶ 29). Heim was an associated person ("AP") of ACM, though she has never been registered with the Commission in any capacity. (Doc. 1, ¶ 29).

4.      Defendant Anthony J. Klatch, II is a resident of Sunny Isles Beach, Florida and was a resident of Tampa, Florida during the time period at issue. (Doc. 1, ¶ 28). Klatch exercised control over ACM, directing its operation and conduct. (Doc. 1, ¶ 28). Klatch solicited investors for ACM and other enterprises, authored and distributed disclosure documents and other marketing materials used to solicit ACM investors, executed or directed others to execute futures and options trades on behalf of ACM and others, and created and distributed false account statements. (Doc.

3

1, ¶ 28).  Klatch was an AP of ACM, though he has never been registered with the Commission in

any capacity. (Doc. 1, ¶ 28).

**B.    Klatch's Prior Commodity Exchange Act Violations, Permanent Injunctive Relief and Restitution Order**

5.      On September 14, 2012, Klatch was sentenced to 60 months in prison, to be

followed by 3 years of supervised release, by the U.S. District Court for the Southern District of

Alabama on charges of securities fraud, wire fraud, money laundering, and conspiracy to defraud

the United States arising out of a massive, multi-year Ponzi scheme. (Doc. 1, ¶ 3); *see also United

States v. Klatch*, Case No. 1:11-cr-00202-WS-N, Judgment in a Criminal Case, Dkt. No. 103 (S.D.

Ala. Sept. 14, 2012).

6.      In a parallel civil proceeding in the U.S. District Court for the Southern District of

New York, the Commission obtained a final judgment against Klatch and other defendants for

violations of the Act and Regulations related to the same conduct charged in his criminal case (the

"Judgment"). (Doc. 1, ¶ 4); *see also CFTC v. Klatch*, Case No. 1:11-cv-05191-DBD, Order of

Final Judgment, Dkt. No. 48 (S.D.N.Y. Mar. 10, 2014) ("*Klatch I*").  The Judgment permanently

enjoined Klatch from further violations of the Act and Regulations, as charged, and also enjoined

Klatch from:

a)  trading on or subject to the rules of any registered entity;

b)  entering into any transactions involving commodity futures, options on commodity futures, commodity options, security futures products, and/or foreign currency (forex);

c)  having any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts traded on his behalf;

d)  controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts; or

4

e)  soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products, and/or forex contracts.

(Doc. 1, ¶ 4); Judgment at pp. 2-3.  The Judgment ordered Klatch to pay, on a joint and several basis with other defendants in the case, $12,919,739 in restitution to the victims of his Ponzi scheme.  (Doc. 1, ¶ 4); Judgment at p. 4.

7.      Klatch was incarcerated from approximately July 29, 2011 to April 1, 2014. (Doc. 1, ¶ 5).  On or about April 1, 2014, Klatch was released from prison and placed on supervised release. (Doc. 1, ¶ 5).  He was remanded back into custody in September 2015 for violating the terms of his supervised release. (Doc. 1, ¶ 5); *see also United States v. Klatch*, Case No. 8:15-cr-00359-SDM-MAP, Judgment in a Criminal Case for Revocation of Supervised Release, Dkt. No. 14 (M.D. Fla. Oct. 2, 2015).

### C.  Defendants' Fraudulent Investment Pool

8.      Between June 2015 and December 2015, Defendants fraudulently solicited $92,000 from 8 individuals and entities for the purpose of investing in the pool operated by ACM. (Doc. 1, ¶ 32; 24-1, ¶ 15) .  Defendants also caused losses of $367,613 in a prospective pool participant's trading account as a direct result of Defendants' fraudulent solicitation of this individual to invest in ACM. (Doc. 1, ¶ 33; 24-1, ¶ 38).

9.      Together, in June 2015, Klatch and Heim established ACM as a Florida limited liability company. (Doc. 1, ¶ 31). ACM's marketing materials, which were available on public websites, represented that ACM was an investment vehicle, "comprised of one investment manager and one risk management officer." (Doc. 24-5, pp. 6, 9)  Despite Klatch's significant involvement in ACM, Heim was the only publically listed manager, was the sole signatory on ACM's bank account, and was the only authorized trader on ACM's trading account. (Doc. 24-1, ¶¶ 12–14).

10.     Defendants utilized various social media and Internet sites to promote ACM and to solicit investors for the pool, including stocktwits.com, Twitter, and Craigslist. (Doc. 1, ¶ 34).

**D.     Misappropriation and Fraudulent Solicitation of Funds**

11.     During Defendants' solicitations of participants, Defendants made material misrepresentations about Klatch, Heim, and ACM. (*See* Doc. 1, ¶ 34-39).

12.     In response to inquiries from several prospective pool participants and in later communications with these same individuals as pool participants, Klatch used the pseudonym "Larry J. Heim." (Doc. 1, ¶ 34).

13.     In communications with other prospective and current pool participants, Klatch utilized his real name; however, in those instances, Klatch materially misrepresented the scope and nature of the *Klatch I* injunction, including representations that he had no restrictions on soliciting funds for investing in futures or options and misrepresentations that his trading ban had been lifted by court order. (Doc. 1, ¶ 35).

14.     Defendants made numerous misrepresentations of material fact to prospective pool participants in order to convince them to invest and to remain invested in ACM. (Doc. 1, ¶ 36). In particular, Defendants falsely represented to current and potential pool participants:

      a.     That ACM (under the name Assurance Capital Partners, LP) launched in July 2013;

      b.     Since ACM's launch, it had generated returns of 131.8% (net of fees) to its investors;

      c.     ACM generated returns of 17.7% from July through December 2013, 64.3% during 2014, and 19.9% in the first 6 months of 2015;

      d.     ACM had over $18 million of assets under management;

      e.     There was an individual named Larry J. Heim, II, who was the Chief Investment Officer of ACM, who held two honors engineering degrees from the Massachusetts Institute of Technology ("M.I.T.") and an MBA in Project Management from the Harvard Business School;

6

    f.     ACM employed a risk manager;

    g.    Pool participants' investments were growing in value;

    h.    Heim managed risk for ACM; and

    i.     Klatch was allowed to trade futures and options on behalf of others.

(Doc. 1, ¶ 36; Doc 24-5, ¶¶ 6–9; Doc. 24-6, ¶¶ 4, 8–10; Doc. 24-2, ¶¶ 7, 10, 12).

15.    These representations were false.  (Doc. 1, ¶ 36; Doc 24-1, ¶ 21).

16.    Assurance Capital Partners, LP, the claimed predecessor entity for ACM, did not exist, and it certainly did not have a profitable trading history.  (Doc 24-1, ¶ 21).

17.    Since its formation in June 2015, ACM never had a balance approaching $18 million as it never had more than $12,400 in its one and only trading account. (Doc 24-1, ¶ 21).

18.    Defendants did not profitably trade pool participants' funds as represented; rather, ACM's trading account consistently suffered losses, with most of the pool participants' funds misappropriated for Defendants' personal use, such as car payments, rent, and country club memberships.  (Doc. 1, ¶¶ 40, 44; Doc 24-1, ¶¶ 21, 25–30, 33).

19.    Larry J. Heim is a fictitious identity.  Klatch utilized the name as a pseudonym to hide Klatch's true identity from potential investors, including his criminal history and permanent trading ban.  (Doc. 1, ¶¶ 51, 59).

20.    ACM did not employ a risk manager. (Doc. 1, ¶ 26, Doc. 24-1, ¶ 21).  Although Defendants held Lindsey Heim out to potential and current pool participants to be responsible for managing ACM's risk, she had absolutely no experience trading futures or in risk management. (Doc. 1, ¶ 26, Doc. 24-1, ¶ 21).

21.    Defendants also failed to disclose material facts to actual and prospective pool participants, including that Klatch was barred from trading futures and options on behalf of others

by virtue of the permanent injunction entered in *Klatch I*, and that Klatch was the subject of a restitution order entered in *Klatch I* in excess of $12,000,000. (Doc. 1, ¶ 37).

### E.   False Account Statements and False Information About the Status of Participants' Investments

22.   Defendants regularly sent periodic updates and account statements via email to pool participants. (Doc. 1, ¶ 40).  Despite the trading losses and misappropriation of funds described above, Defendants misrepresented to pool participants that their funds had been invested in futures and options on futures, and that participants' investments were retaining their value and generating profits. (Doc. 1, ¶ 40).

23.   Defendants' communications falsely indicated that the pool participants' interests in the pool were consistently growing in value—providing false account ledgers showing inflated values for pool participants' investments. (Doc. 1, ¶ 40).  In reality, however, ACM never generated a profit for pool participants.  (Doc. 1, ¶ 40).

24.   Defendants also created and provided to current and prospective pool participants falsified trading account statements purportedly issued by Futures Commission Merchants ("FCMs") showing an inflated ACM account value and false trading information.  (Doc. 1, ¶ 41).

25.   Defendants even sent a copy of a falsified account statement to at least one prospective pool participant purportedly showing ACM had a June 30, 2015 trading account balance at an FCM of over $18 million.  In reality, ACM did not even have an account with this particular FCM.  (Doc. 1, ¶ 55; Doc. 24-5, ¶ 9).

### F.   Defendant's Fraudulent Solicitation of a Prospective Pool Participant

26.   In July 2015, Klatch met a prospective ACM investor through the online investor forum stocktwits.com. (Doc. 1, ¶ 50).  The on-line stocktwits.com user profile page—which was in the name of ACM and purported to be owned by "L Heim"—contained a link to a website

containing a one-page fund overview of ACM that included Larry J. Heim's phony biography and ACM's false performance history, all of which the prospective pool participant accessed and reviewed. (Doc. 1, ¶¶ 51–52).

27.     Through a series of telephone and email communications, Klatch (holding himself out as Larry J. Heim) solicited the prospective pool participant to invest in ACM, provided ACM offering documents and bank wire instructions, and offered to waive fees for a period of time in exchange for an immediate investment. (Doc. 1, ¶¶ 53–54). Klatch (continuing to hold himself out as Larry J. Heim), in soliciting the prospective pool participant to make an investment in ACM, offered to trade the prospective pool participant's personal trading account. (Doc. 1, ¶ 56).

28.     In the course of making this offer, Klatch represented that he would trade the account conservatively and profitably—consistent with ACM's purported trading history, which was misrepresented in both the materials on-line and those sent directly to the prospective pool participant to be up 131.8% (net of fees) since July 2013, with an average 4.8% monthly return on investment. (Doc. 1, ¶ 57).

29. The prospective pool participant granted "Larry J. Heim" access to trade his personal trading account from July 27, 2015 through July 29, 2015. (Doc. 1, ¶ 58). Rather than trading the account conservatively as represented, Klatch traded the account aggressively. (Doc. 24-1, ¶ 37; Doc. 1, ¶ 57). Over the course of 3 days, Klatch's trading resulted $367,613 in losses in the prospective pool participant's trading account. (Doc. 1, ¶ 58; Doc. 24-1, ¶ 38).

### G.     Klatch's Managed Account Fraud

30.     During the Relevant Period, Klatch personally managed the accounts of others (in addition to the prospective pool participant discussed above). (*See* Doc. 1, ¶¶60–83).

31.    Not long after his release from prison, Klatch began advertising his "expertise" in trading futures and options, and he began offering group and individualized trading classes. (Doc. 1, ¶ 60). He also sold subscriptions to his on-line trading room, in which he both forecasted market movements and made real-time buy/sell recommendations. (Doc. 1, ¶ 61).

32.    Klatch used these trading courses and his trading room to bolster his image as a knowledgeable trader and to gain direct access to potential investors who would either invest money in an entity operated by Klatch or permit Klatch to manage their trading accounts for a fee. (Doc. 1, ¶ 62).

33.    In early 2015, Klatch met a customer through a social media website stocktwits.com. (Doc. 1, ¶ 64). Klatch provided investment advice and trade recommendations, and told the customer about the books Klatch had self-published on trading that touted Klatch's market expertise. (Doc. 1, ¶ 65). Klatch misrepresented to the customer that he was allowed to trade futures and options on behalf of others and that he could provide trading advice; and Klatch failed to disclose the existence of the *Klatch I* injunction and restitution order. (Doc. 1, ¶ 67).

34.    The customer signed up for Klatch's trading classes and, at Klatch's suggestion, began actively trading futures.  (Doc. 1, ¶ 68). The customer opened a personal trading account and later opened a second trading account in the name of a company the customer controlled. (Doc. 1, ¶¶ 72,74).

35.    After setting up the accounts, Klatch offered to profitably trade the customer's accounts for a fee. (Doc. 1, ¶ 69). The customer agreed and allowed Klatch direct access to trade the accounts. (Doc. 1, ¶¶ 69). Over the course of about two months, Klatch's trades and investment advice resulted in $41,709 in trading losses in the accounts. (Doc. 1, ¶ 72, 74; Doc. 24-1, ¶ 63).

36.     Klatch also fraudulently obtained payments of at least $5,164 from this customer
for providing commodity trading advice.  (Doc. 1, ¶ 70, 74; Doc. 24-1, ¶ 63).

### H.     Klatch's Fraud in Connection with Trading of Futures and Options (Non-Managed Account Fraud)

37.     While serving time in prison for his conviction in the U.S. District Court for the
Southern District of Alabama, Klatch regularly touted his market theories and trading expertise
to other inmates. (Doc. 1, ¶ 76).  Klatch even held informational classes—teaching fellow
inmates how to invest and trade futures and options. (Doc. 1, ¶ 76).

38.     Prior to his release from prison, Klatch promised at least one inmate that he would
provide the fellow inmate with an investment opportunity after they were both released. (Doc. 1,
¶ 77).

39.     Around July 2014, Klatch solicited a former, fellow inmate to invest in KAPA
Management Corp. ("KAPA"), a company Klatch claimed was engaged in trading and investing
in the market. (Doc. 1, ¶ 78).  Klatch claimed that he was a member of KAPA's upper management
team and promised a 10% per month return on investment. (Doc. 1, ¶ 78).  Klatch never disclosed
that he was not allowed to trade futures or that there were restrictions on his ability to invest or
trade on behalf of himself or others. (Doc. 1, ¶ 79).

40.     On August 29, 2014, the investor wired $50,000 to KAPA. (Doc. 1, ¶ 80; Doc. 24-1, ¶ 68).  The investor never received any payments in return. (Doc. 1, ¶ 82).  Rather, all of the
victim's investment was misappropriated for Klatch's personal use or lost in connection with the
trading of futures and options. (Doc. 1, ¶¶ 80–81).

## II.    Conclusions of Law

### A.    Jurisdiction and Venue

41.    This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

42.    Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e) (2012), because Defendants transacted business in this District, and certain of the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

### B.    Futures Fraud – Count I

43.    Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C) (2012), makes it unlawful for any person, in or in connection with any order to make or the making of any futures contract to: (a) cheat, defraud or attempt to cheat or defraud the other person; (b) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; or (c) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract or in regard to any act of agency performed, with respect to any order or contract for such other person.

44.    By the conduct described in paragraphs 1 through 40 above, Defendants cheated and defrauded, or attempted to cheat and defraud, and willfully deceived, or attempted to deceive,

12

their customers, pool participants, or clients in or in connection with any order to make or the making of any futures contract by, among other things,  knowingly or recklessly: (a) misappropriating participants' funds; (b) making material misrepresentations and omitting material facts; (c) causing false trading account statements and investment ledgers to be issued to actual and prospective pool participants that reflected non-existent profits; and (d) misrepresenting that Klatch was allowed to trade futures on behalf of others, all in violation of Section 4b(a)(1)(A)-(C) of the Act, 7 U.S.C. § 6b(a)(1)(A)-(C).

**C.     Options Fraud – Count II**

45.     Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 33.10, 17 C.F.R. § 33.10 (2016), make it unlawful for any person directly or indirectly: (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; or (c) to deceive or attempt to deceive any other person by any means whatsoever, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transactions.

46.     By the conduct described in paragraphs 1 through 40 above, Defendants cheated and defrauded, or attempted to cheat and defraud, and willfully deceived, or attempted to deceive, their customers, pool participants, or clients in or in connection with any commodity options transactions by, among other things, knowingly or recklessly: (a) misappropriating participants' funds; (b) making material misrepresentations and omitting material facts; (c) causing false trading account statements and investment ledgers to be issued to actual and prospective pool participants that reflected non-existent profits; and (d) misrepresenting that Klatch was allowed to trade commodity options on behalf of others, all in violation of Section 4b(c) of the Act, 7 U.S.C. § 6c(b), and Regulation 33.10, 17 C.F.R. § 33.10.

### D.   Fraud by Deceptive Device or Contrivance – Count III

47.    Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012) provides, in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, to use or employ or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the Commission shall promulgate." Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2016) provides in relevant part, that "[i]t shall be unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) Use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) Make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; [or] (3) Engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person."

48.    By the conduct described in paragraphs 1 through 40 above, Defendants used or employed deceptive devices or contrivances, in connection with a contract of sale of a commodity for future delivery on or subject to the rules of any registered entity, including, but not limited to: (a) misappropriating participants' funds; (b) making material misrepresentations and omitting material facts; (c) causing false trading account statements and investment ledgers to be issued to actual and prospective pool participants that reflected non-existent profits; and (d) misrepresenting that Klatch was allowed to trade futures on behalf of others, all in violation of Section 6(c)(1) of the Act and Regulation 180.1(a).

14

E.      **Fraud by a Commodity Pool Operator and Associated Person Thereof; and Fraud by Commodity Trading Advisor – Count IV**

49.      Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012), prohibits any Commodity Pool Operator ("CPO"), Commodity Trading Advisor ("CTA"), or Associated Persons ("APs") thereof, from using the mails or any other means of interstate commerce to: (A) employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or (B) engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

50.      By the conduct described in paragraphs 1 through 40 above, ACM acted as a CPO in that they engaged in a business that is of the nature of an investment trust, syndicate or similar form of enterprise operated for the purpose of trading in commodity interests or commodity futures, and in connection therewith, solicited, accepted and received funds from others for the purpose of trading in commodity interests and commodity futures.

51.      By the conduct described in paragraphs 1 through 40 above, Klatch and Heim acted as APs of ACM by soliciting funds for the pool and handling participant monies while being associated with ACM as a partner, officer, employee, consultant, or agent (or person occupying a similar status or performing similar functions).

52.      By the conduct described in paragraphs 1 through 40 above, Defendants violated Section 4o(1) of the Act, in that Klatch and Heim, while acting as APs of a CPO, and ACM, while acting as a CPO, defrauded and deceived actual and prospective participants of ACM, by among other things: (a) misappropriating participants' funds; (b) making material misrepresentations and omitting material facts to prospective and actual participants, and (c) causing false trading account statements and investment ledgers to be issued to actual and prospective participants that reflected

non-existent profits. Defendants engaged in such acts, directly or indirectly, by the use of the mails and other means or instrumentalities of interstate commerce.

53.     By the conduct described in paragraphs 1 through 40 above, Klatch acted as a CTA in that he, for compensation or profit, engaged in the business of advising others, either directly or through publications, writings, or electronic media, as the value of or the advisability of trading in any contract of sale of a commodity for future delivery, security futures product, or swap; or, that he, for compensation or profit, as part of a regular business, issued or promulgated analyses or reports concerning any contract of sale of a commodity for future delivery, security futures product, or swap.

54.     Klatch violated Section 4$\underline{o}$(1) of the Act, in that, while acting as a CTA, he defrauded actual and prospective clients, by among other things: (a) misappropriating participants' funds; (b) making material misrepresentations and omitting material facts; (c) causing false trading account statements to be issued to actual and prospective clients; and (d) misrepresenting Klatch's true identity to actual and prospective clients and misrepresenting that he was permitted to solicit funds or trade futures or options on behalf of others.

55.     Klatch engaged in such acts, directly or indirectly, by the use of the mails and other means or instrumentalities of interstate commerce.

**F.      Failure to Operate the Pool as Separate Legal Entity/Register as a Commodity Pool Operator – Count V**

56.     Regulation 4.20(a), 17 C.F.R. §4.20(a) (2016), requires a CPO to "operate its pool as an entity cognizable as a legal entity separate from that of the pool operator."

57.     Regulation 4.20(b), 17 C.F.R. § 4.20(b) (2016), requires that "[a]ll funds . . . received by a commodity pool operator from an existing or prospective pool participant for the purchase of an interest . . . in a pool that it operates . . . must be received in the pool's name."

58.     Regulation 4.20(c), 17 C.F.R. § 4.20(c) (2016), prohibits a CPO from "commingling the property of any pool that it operates or that it intends to operate with the property of any other person."

59.     By the conduct described in paragraphs 1 through 40 above, ACM, acting as a CPO, violated Regulation 4.20(a)-(c), 17 C.F.R. § 4.20(a)-(c), by (1) failing to operate the pool as a separate legal entity; (2) accepting funds from participants in accounts in the name of ACM and Klatch, rather than in the name of the pool; (3) transferring pool participants' funds to Klatch's and Heim's personal accounts (including Klatch's PayPal accounts), where those funds were commingled with funds belonging to others; and (4) operating a trading account in the name of ACM that was funded with pool participants' money.

### G.     ACM Is Liable for the Violations of Heim and Klatch

60.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2012), and Regulation 1.2, 17 C.F.R. § 1.2 (2016) provide that the "act, omission, or failure of any official, agent, or other person acting for any . . . partnership . . . within the scope of his employment or office shall be deemed the act, omission, or failure of such . . . partnership . . . ."

61.     Because Heim and Klatch committed the acts, omissions, or failures described in paragraphs 1 through 40 above within the scope of their employment or office within ACM, ACM is liable for Heim's and Klatch's violations of the Act alleged in Counts I, II, III, and IV of the Complaint pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), Regulation 1.2, 17 C.F.R. § 1.2.

### H.     Heim and Klatch Are Liable for ACM's Violations as Controlling Persons

62.     Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2012) provides that a person who

directly or indirectly controls any other person[1] who violated the Act may be held liable for such violation to the same extent as such controlled person.

63.    By the conduct described in paragraphs 1 through 40 above, Heim and Klatch exercised control of ACM, and knowingly induced, directly or indirectly, all the conduct which constituted violations of the Act alleged in Counts I, II, III, IV, and V of the Complaint.

64.    Unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of the Act and Regulations.

## ORDER FOR RELIEF

**IT IS HEREBY ORDERED THAT:**

65.    The Commission's Motion for Entry of Default Judgment, Permanent Injunction, Civil Monetary Penalties, and Ancillary Equitable Relief against Defendants is **GRANTED**.

**IT IS HEREBY ORDERED THAT:**

**A.    Permanent Injunction**

66.    Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), Defendants ACM and Heim are permanently restrained, enjoined and prohibited from directly or indirectly:

   a.    Willfully cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person in violation of Section 4b(a)(1)(A) of the Act, 7 U.S.C. §§ 6b(a)(1)(A) (2012);

---

[1] Pursuant to 7 U.S.C. § 1a(38), the term "person" "includes individuals, associations, partnerships, corporations, and trusts."

b.       Willfully making or causing to be made false statements or reports to another person in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery that is made, or to be made, for or on behalf of, or with, any other person in violation of Section 4b(a)(1)(B) of the Act, 7 U.S.C. § 6b (a)(1)(B) (2012);

c.       Willfully cheating or defrauding, or attempting to cheat or defraud, other persons in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction in violation of Section 4c(b) of the Act, 7 U.S.C. §§ 6c(b) (2012), and Regulation 33.10, 17 C.F.R. § 33.10 (2016);

d.       Willfully making or causing to be made false statements or reports to another person in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2012), and Regulation 33.10, 17 C.F.R. § 33.10 (2016);

e.       While acting as a CPO or AP, employing any device, scheme, or artifice to defraud any client or participant or prospective client or participant, or engaging in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2012); and

f.       Intentionally or recklessly using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud; making, or attempting to make, any untrue or misleading statement of a material fact or to omit to state a material

19

fact necessary in order to make the statements made not untrue or misleading; or engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012) and Commission Regulation 180.1(a), 17 C.F.R. § 180.1(a) (2016).

67.   Based upon and in connection with the foregoing conduct, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), Defendant Klatch permanently restrained, enjoined and prohibited from directly or indirectly:

   a.   Intentionally or recklessly using or employing, or attempting to use or employ, any manipulative device, scheme, or artifice to defraud; making, or attempting to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or engaging, or attempting to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, in violation of Section 6(c)(1) of the Act, 7 U.S.C. § 9(1) (2012),  and Regulation 180.1(a), 17 C.F.R. §180.1(a) (2016).

68.   Defendants ACM and Heim, and its and her affiliates, agents, servants, employees, successor, assigns, attorneys, and all person in active concert with them, are also permanently restrained, enjoined and prohibited from directly or indirectly:

a. Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(40) of the Act, 7 U.S.C. § 1a(40) (2012));

b. Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2016)) for their personal account or for any account in which they have a direct or indirect interest;

c. Having any commodity interests traded on their behalf;

d. Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2016); and/or

g. Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2016)), agent or any other officer or employee of any person (as that term is defined in Section 1a(38) of the Act, 7 U.S.C. § 1a(38) (2012)) registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2016).

69. Defendant Klatch and his affiliates, agents, servants, employees, successor, assigns, attorneys, and all persons in active concert with him, are also permanently restrained, enjoined and prohibited from directly or indirectly:

a.   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3(yy), 17 C.F.R. § 1.3(yy) (2016) for his own personal or for any account in which he has a direct or indirect interest;

b.   Having any commodity interests traded on his behalf;

c.   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests; and/or

d.   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests.

70.   Defendant Klatch must make the following written disclosure in connection with any speech, presentation, website, mailing, or other readable material that he or any agent creates, makes, provides, operates, or sends relating in any manner to commodity interests:

> "I have violated the Commodity Exchange Act and CFTC Regulations. After being sued by the CFTC in federal courts in New York and Florida, I have been collectively ordered to pay $13,476,225 in restitution to victims of my illegal conduct. I have also been ordered to pay $1,845,008 in civil monetary penalties for my illegal conduct. In addition, I have been permanently enjoined from, among other things:  1) entering into any transactions involving commodity interests; 2) controlling or directing the trading for or on behalf of any other person or entity in any account involving commodity interests; or 3) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests. Case numbers for the CFTC actions against me are: U.S. District Court for the Southern District of New York, 11-cv-5191, and U.S. District Court for the Middle District of Florida, 17-cv-213."

## B.   Restitution

71.   Defendants shall, jointly and severally, pay restitution in the amount of $459,613 (four hundred fifty-nine thousand, six hundred thirteen dollars), plus post-judgment interest. Defendant Klatch shall also pay an additional $96,873 (ninety-six thousand, eight hundred

seventy-three dollars) in restitution (such that Klatch's total restitution obligation is $556,486 (five hundred fifty-six thousand, four hundred eighty-six dollars)) (collectively "Restitution Obligation"), plus post-judgment interest.  Post-judgment interest shall accrue on Defendants' Restitution Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

72.     Defendant Klatch and Heim are currently the defendants in criminal actions charging them, in part, for the misconduct that is at issue in this matter.  *See United States v. Klatch*, Case No. 17-cr-00135-JDW-JSS, United States District Court for the Middle District of Florida; *see also United States v. Heim*, Case No. 17-cr-00071-SDM-AEP, United States District Court for the Middle District of Florida ("Criminal Actions").   For amounts disbursed to Defendants' customers, pool participants, or clients as a result of satisfaction of any restitution ordered in the Criminal Actions, the Defendants shall receive a dollar-for-dollar credit against the Restitution Obligation.   Within ten (10) days of disbursement in the Criminal Action to Defendants' customers, pool participants, or clients, Defendant shall, under a cover letter that identifies the name and docket number of this proceeding, transmit to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581, and the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, copies of the form of payment to those customers, pool participants, or clients.

73.     To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' customers, pool participants, or clients, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").   The Monitor shall collect

restitution payments from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

74. Defendants shall make Restitution Obligation payments under this Order to the Monitor in the name "Klatch, Heim, and Assurance Capital Management Fund" and shall send such Restitution Obligation payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

75. The Monitor shall oversee the Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' customers, pool participants, or clients identified by the Commission or may defer distribution until such time as the Monitor deems appropriate. In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative cost of making a distribution to eligible customers, pool participants, or clients is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth below.

76.   Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' customers, pool participants, or clients to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

77.   The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' customers, pool participants, or clients during the previous year. The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

78.   The amounts payable to each customer or participant shall not limit the ability of any customer or pool participant from proving that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any pool participant that exist under state or common law.

79.   Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each customer or participant who suffered a loss is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Order and to hold Defendants in contempt for any violations of any provision of this Order.

80.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' restitution obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

## C.     Civil Monetary Penalty

81.     Defendants shall pay, jointly and severally, a civil monetary penalty of $1,509,552 (one million, five hundred nine thousand, five hundred fifty-two dollars), plus post-judgment interest.  Klatch shall also pay an additional civil monetary penalty of $335,456 (three hundred thirty-five thousand, four hundred fifty-six dollars) (such that his total civil monetary penalty obligation is $1,845,008 (one million, eight hundred forty-five thousand, eight dollars) (collectively, "CMP Obligation"). Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2012).

82.     Defendants shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN:  Accounts Receivables
> DOT/FAA/MMAC/AMZ-341
> CFTC/CPSC/SEC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-7262 office
> (405) 954-1620 fax
> nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those

instructions.  Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding.  Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

**D.    Provisions Related to Monetary Sanctions**

83.    Partial Satisfaction:  Acceptance by the Commission/CFTC or the Monitor of any partial payment of Defendants' Restitution Obligation or CMP Obligation, shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the Commission/CFTC's right to seek to compel payment of any remaining balance.

**E.    Miscellaneous Provisions**

84.    Notice:  All notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

Charles Marvine
Deputy Director, Division of Enforcement
U.S. Commodity Futures Trading Commission
4900 Main Street, Suite 500
Kansas City, MO 64112
(816) 960-7700

Notice to NFA:

Daniel Driscoll, Executive Vice President, COO
National Futures Association
300 S. Riverside Plaza, Suite 1800
Chicago, IL 60606-3447

All such notices to the Commission shall reference the name and docket number of this action.

85.    Change of Address/Phone:  Until such time as Defendants satisfy in full the Restitution Obligation and CMP Obligation as set forth in this Order, Defendants shall provide

written notice to the Commission by certified mail of any change to their telephone number and mailing address within ten (10) calendar days of the change.

86.    Invalidation:  If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

87.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Order for a period of 12 months from the date of this order.

88.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Order shall be binding upon Defendants, upon any person under the authority or control of any of the Defendants, and upon any person who receives actual notice of this Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Order for Final Judgement by Default, Permanent Injunction, Civil Monetary Penalties, and Ancillary Statutory and Equitable Relief* forthwith and without further notice.

**IT IS SO ORDERED** on this __23rd__ day of ___June___, **2017**.

SUSAN C. BUCKLEW
UNITED STATES DISTRICT JUDGE

28